**Joel JOHNSON, Individually, and as Next Friend of Brian Johnson, and Barbara Johnson, Appellants,**

v.

**KNOXVILLE COMMUNITY SCHOOL DISTRICT, Appellee.**

No. 95–1686.

Supreme Court of Iowa.

Nov. 26, 1997.

Barry A. Russell and Lu Ann White of Hanson, Bjork & Russell, L.L.P., Des Moines, David A. Johnson of Johnson & Lane, Knoxville, and Frederick G. White, Waterloo, for appellants.

Brian L. Campbell and Karl T. Olson of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellee.

SNELL, Justice.

The plaintiffs appeal the denial of their motion for new trial after a jury returned a verdict finding defendant's negligence was not the proximate cause of the damages claimed. We reverse and remand for a new trial.

On February 27, 1992, Brian Johnson, age ten, fell and hit his head on the playground at East Elementary School in Knoxville, Iowa. The accident happened while Brian attempted to dunk a basketball by jumping off the back of another student. After the incident, Brian was taken inside to the school nurse's office and then to Knoxville Hospital, where he was diagnosed with a closed head injury. He was taken by Life Flight to Iowa Methodist Medical Center in Des Moines, where he was treated and observed. Brian was moved out of intensive care on the morning of February 28, and discharged on February 29.

In the months following his discharge, Brian experienced frequent and severe headaches, symptoms of obsessive-compulsive disorder (OCD), and other behavior problems.

Brian's grades, basic skills scores, and cognitive skills all fell subsequent to the accident. These deficiencies, coupled with an increase in behavioral problems at school, led Brian's parents to take him to a number of medical and psychological specialists, who administered a battery of tests in an attempt to diagnose the problem. Brian was diagnosed with numerous physical, cognitive, and behavioral deficits. Medical professionals prescribed both pharmaceutical and behavioral methods of treatment, which were effective in varying degrees. Brian's problems are, in all likelihood, permanent, although they can be controlled to some extent through proper medication and counseling.

On February 4, 1994, Brian's parents, Joel and Barbara Johnson, filed a petition at law against the Knoxville Community School District seeking damages for the personal injuries suffered by Brian as a result of the February 1992 fall and the district's alleged negligence. The parents also sought damages for loss of consortium. The district filed an answer on February 24, denying the plaintiffs' allegations of negligence, proximate cause, and damages. However, at trial, the district stipulated that Brian's accident was the result of its negligence, but denied that such negligence was the proximate cause of his injuries.

The case proceeded to a jury trial on the issues of causation and damages. The district court included the defendant's stipulation of negligence in its jury instructions. After deliberation, the jury found that the negligence of the defendant was not a proximate cause of the damages sought by plaintiffs. The jury proceeded no further with the verdict form. The plaintiffs filed a motion for new trial, asserting, among other grounds, that the finding of no proximate cause was contrary to overwhelming evidence. The district court denied the motion in a one-sentence ruling without a hearing. It is from this denial that the plaintiffs appeal.

## I. Issues on Appeal

The plaintiffs assert the district court erred in allowing the introduction of certain expert testimony by the defendant concerning the causes of Brian's behavioral problems. Further, the plaintiffs argue the defendant used evidence of prior head injuries to impermissibly argue fault on Brian's part, when comparative fault was not pled. They further contend the jury was impermissibly allowed to consider the issue of parental discretion by disguising it as a proximate cause issue rather than an allegation of fault.

The plaintiffs also contend the district court erred in failing to grant their motion for new trial because the jury's verdict was "wholly inadequate in light of the overwhelming weight of the evidence, and such inadequacy appears to have been influenced by passion and prejudice" on the part of the jury. They maintain that the evidence proved that Brian had suffered at least a minor to moderate head injury and that the injury clearly caused some damages. They claim the only appropriate remedy is a remand for a new trial on all issues.

## II. Standard of Review

■ We review the denial of a motion for new trial for correction of errors at law. Iowa R.App. P. 4; *Ladeburg v. Ray*, 508 N.W.2d 694, 697 (Iowa 1993). However, if the motion is based on a discretionary ground, we review for abuse of discretion. *Ladeburg*, 508 N.W.2d at 697. A ruling on a motion for new trial, as it pertains to the adequacy of a jury verdict, is a matter for the trial court's discretion. *Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 326 (Iowa 1996); *Shepherd Components, Inc. v. Brice Petrides–Donohue & Assocs., Inc.*, 473 N.W.2d 612, 618 (Iowa 1991).

## III. Expert Testimony of Dr. Nordine

■ The plaintiffs assign error in the trial court's decision to allow defendant's expert, Dr. Gaylord Nordine, to testify at trial. Dr. Nordine is a physician practicing general psychiatry. He is licensed in Iowa and has been a board-certified psychiatrist since 1979. He practices exclusively in the field of neuropsychiatry which focuses on neuro-scientific and neuro-medical aspects of the relationship between neurology and psychiatry. The use of the term "neuropsychiatry" means that the physician is emphasizing, in

the study of cases, neurologic or so-called organic or neuro-medical aspects and psychological aspects.

Prior to trial, Dr. Nordine performed an independent examination of Brian where, pursuant to the parties' agreement, Joel Johnson, Brian's father, was present to observe and help Brian answer questions. Dr. Nordine conducted a two-hour interview but did not commence a formal psychiatric evaluation. He testified at deposition that Newtonian forces suggested that Brian had suffered a mild to moderate closed head injury. He testified that OCD can occur as a result of a head injury. In Brian's case, he found from the medical records that the OCD symptoms and clinical findings commenced at least one year following injury. At trial, Dr. Nordine testified that his medical opinion was that the OCD symptoms exhibited by Brian could not have been caused by the playground accident in 1992. The reason given was that from a clinical perspective the temporal relationship between the injury and the onset of the symptoms was too long. He added that the mechanism of the injury in this case is not typically what is associated with traumatic OCD, which derives from a deep brain injury.

Dr. Nordine opined that Brian's temper outbursts and other behavior show that he is a boy under stress in his life. Within the context of the interview, his impression was that Brian tended to defer to his father and depended on him for leadership in answering questions. Dr. Nordine's medical opinion was that Brian's obsessive-compulsive features are naturally-occurring, and are related to family characteristics presented by his father clinically and by his father's writings in a journal describing Brian's OCD symptoms.

Before trial, the plaintiffs filed a motion in limine seeking to preclude Dr. Nordine from testifying on behalf of the defendant. In their motion, the plaintiffs asserted that

pursuant to Iowa Rule of Evidence 702 and 703, Dr. Nordine's opinion and testimony should not be allowed. His testimony does not pertain to "scientific knowledge" and the reasoning underlying the testimony is not scientifically valid. Iowa R. Evid. 702.

Further, the opinions are not based on a reliable foundation and are not relevant.

Actually, the motion sought to have the district court apply the analysis for admission of expert testimony according to principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and hold Dr. Nordine's testimony inadmissible under those principles.

The district court heard and denied the motion on the morning of trial. The plaintiffs reasserted their objection prior to Dr. Nordine's testimony. They claimed there was no scientific evidence that OCD traits could be inherited through a parent, and noted Dr. Nordine's testimony was based solely on a two-hour interview. They maintained that Dr. Nordine impermissibly formed an opinion of the mental condition of Joel Johnson, whose condition was not at issue in the case. The plaintiffs also contended that Dr. Nordine's testimony should have been excluded because he was deposed only one day prior to the discovery deadline set by the court and appeared without any final report or opinion. Finally, they claimed the prejudicial effect of Dr. Nordine's opinion outweighs any probative value it may have. The district court denied these objections and Dr. Nordine was allowed to present expert testimony.

Iowa Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

■ Our case law decided both before and after the adoption of this rule is clear that "we are committed to a liberal view on the admissibility of expert testimony, and we have been quite deferential to the district court in the exercise of its discretion in that area." *Mensink v. American Grain*, 564 N.W.2d 376, 380 (Iowa 1997). We will not reverse the district court's admission of expert testimony "absent a manifest abuse of that discretion to the prejudice of the com-

plaining party." *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 827 (Iowa 1993).

We have laid down several principles governing the admissibility of expert testimony. First, the testimony must aid the jury in resolving a disputed issue. *Williams v. Hedican,* 561 N.W.2d 817, 823 (Iowa 1997). Second, the testimony must be reliable. *Id.* This requirement necessarily follows from the first because unreliable testimony cannot assist a trier of fact. *Id.* Third, the amount of foundation necessary to establish reliability depends on the complexity of the testimony and the likely impact of the testimony on the fact-finding process. *Id.* On this point we said in *State v. Hall:*

> Determinations of admissibility of such evidence must necessarily be made on an ad hoc basis, ... and it would be impossible to establish rules binding in every case. Obviously the complexity of the subject matter will influence the foundational showing of reliability. For example, the foundation for neutron activation analysis ... or polygraph evidence .... would require greater input from the scientific community than, for example, blow-ups of handwriting exemplars, ballistic comparisons, or tire tracks.

*State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980) (citations omitted). Last, there is no requirement that the expert be able to express an opinion with absolute certainty. *Williams,* 561 N.W.2d at 823. A lack of absolute certainty goes to the weight of the expert's testimony, not to its admissibility. *Id.*

In contrast to our guideline principles applicable to rule 702, *Daubert* suggested the following framework for determining the admissibility of expert scientific testimony:

> [T]he trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that rea-soning or methodology properly can be applied to the facts in issue.

*Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796, 125 L.Ed.2d at 482 (footnotes omitted).

In addition, the Supreme Court set forth a nonexhaustive checklist to help trial courts determine whether the underlying reasoning and methodology are both scientifically valid and applicable to the issues in the case. The checklist includes whether the theory or technique (1) can be (and has been) tested, (2) has been subjected to peer review and publication, (3) is generally accepted within the relevant scientific community, and (4) has a known or potential rate of error. *Id.* at 593–94, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 483.

In *Williams,* we noted that a *Daubert* analysis can be time consuming and costly. *Williams,* 561 N.W.2d at 827. We also cited those federal cases that have taken a restrictive approach to *Daubert,* and we left open the question under what circumstances we would depart from our past interpretation of rule 702 and adopt the *Daubert* framework of analysis. *Id.*

Shortly following *Williams,* we refused to apply *Daubert* to a determination of whether expert testimony on lightning safety was admissible in an action brought against the owners of a grain elevator by an individual who was injured when lightning caused an explosion of accumulated grain dust. *Mensink,* 564 N.W.2d at 381. We cited with approval those federal cases holding that *Daubert* applies—in the language of rule 702—only to novel scientific testimony and is simply not applicable to "technical or other specialized knowledge." *Id.* at 380–81. We concluded the expert's testimony about the risk factors making the building vulnerable to lightning did not involve a "highly complex matter of scientific evidence" and "were not complicated or novel ideas or even foreign to a layperson's understanding about the phenomenon of lightning." *Id.* at 381. Employing our own conventional rule 702 analysis, we concluded the expert witness "sufficiently established the reliability of this evidence and that it would likely assist the fact finder in determining the facts in issue." *Id.*

In *Mensink,* we cited with approval *Thornton v. Caterpillar, Inc.,* 951 F.Supp. 575 (D.S.C.1997). *Id.* at 380–81. *Thornton* concluded that *Daubert* should be narrowly limited to controversial and novel scientific evidence. *Thornton* is instructive because it defines the terms "scientific," "technical," and "other specialized knowledge" as used in rule 702:

> The *Daubert* test cannot, and was not intended to, apply to expert testimony that is technical in nature, or to expert testimony that covers specialized knowledge. Footnote 8 of the *Daubert* decision clearly states that:
>
>> Rule 702 *also* applies to technical and other specialized knowledge. Our discussion is limited to the scientific context because that is the nature of the expertise offered here.
>
> Random House Dictionary defines "technical" as anything "pertaining to or connected with the mechanical or industrial arts and the applied sciences." Technical knowledge is the knowledge of these mechanical and industrial arts and the applied sciences.
>
> Random House Dictionary defines one who specializes as one who pursues "some special line of study, work, etc." Specialized knowledge refers to any knowledge focused on a particular area of study, profession, or experience.
>
> Scientific knowledge differs from technical and specialized knowledge in that it is a validation. Scientific knowledge is the process of formulating a hypothesis and then engaging in experimentation or observation to verify or falsify that hypothesis. It is this knowledge garnered from experimentation and observation that was offered as evidence in *Daubert.*
>
> The rules set forth in *Daubert* simply are not applicable to "technical or other specialized knowledge." And the Court so stated. Fed.R.Evid. 702 has not been repealed or modified or changed in any way when it comes to admitting "technical" or other "specialized knowledge." These terms are of equal importance and on an equal footing with the phrase "scientific testimony."

*Thornton,* 951 F.Supp. at 577–78 (citations and footnotes omitted).

The court in *Thornton* goes on to declare that

> the principles enunciated in *Daubert* should be narrowly limited to controversial and novel scientific evidence. *Daubert* has no other application for use in the expert field of engineering, as well as the fields of *general medical issues,* real estate or other types of technical subjects or those requiring specialized knowledge.

*Id.* at 578 (emphasis added). The court singled out auto mechanics, engineers, accountants, attorneys, DEA agents, IRS agents, real estate appraisers, and the like as those having technical knowledge and therefore not covered by *Daubert. Id.*

One state court, in line with *Thornton,* refused to apply the *Daubert* analysis in a medical malpractice case to expert medical testimony that, based on reasonable medical certainty, a particular treatment defendant failed to give would have been effective for the plaintiff's condition. *See Reese v. Stroh,* 128 Wash.2d 300, 907 P. 2d 282, 286 (1995) (en banc). The court held that a conventional analysis under its rules of evidence was more appropriate because the expert's medical opinion was based on practical experience and acquired knowledge and not on some novel scientific procedure. *Id.*

Recently, the Ninth Circuit decided a case interpreting *Daubert* and restricting its application. In *McKendall v. Crown Control Corp.,* 122 F.3d 803 (9th Cir.1997), the plaintiff was injured while operating a stock picker to shelve cargo. He alleged defective design of the picker. He offered expert testimony of an experienced mechanical and metallurgical engineer that a safety device should have been in place. The district court granted summary judgment for defendant after excluding the proposed testimony as scientifically unreliable. The Ninth Circuit reversed and remanded, holding that the *Daubert* analysis did not apply. The court stated:

> Here, the district court presumed that for Siegel's testimony to be admissible, it must be based on "scientific" knowledge to

which the *Daubert* factors would apply. The district court was particularly troubled that Siegel had not built or tested the safety device he proposed. Consequently, based on Rule 702 and *Daubert*, the district court concluded that Siegel's testimony was not reliable and thus would not be helpful to a trier of fact.

McKendall does not contend that Siegel's testimony would withstand an application of the *Daubert* factors. Rather, he argues that the district court erred in applying the *Daubert* factors to Siegel's testimony since Siegel's testimony was not based on "scientific" knowledge. McKendall asserts that Siegel's testimony is based on his experience as a mechanical engineer who has investigated hundreds of forklift accidents. He argues that Siegel has "technical, or other specialized knowledge" described in Rule 702, and to which the *Daubert* factors, applicable to scientific knowledge, do not apply. Thus, he proposes that Siegel's testimony should have been admitted under Rule 702, as Siegel demonstrated through experience, training, and education his familiarity with forklifts. Furthermore, he argues, this technical or other specialized knowledge would have assisted the trier of fact to understand the evidence and to determine facts in issue, consistent with Rule 702.

We agree that the district court erred in applying the *Daubert* factors, which are relevant only to testimony bearing on "scientific" knowledge, to Siegel's testimony. The Ninth Circuit has recognized that *Daubert* is confined to the evaluation of "scientific" expert testimony. *See Cordoba*, 104 F.3d at 230 ("*Daubert* applies only to the admission of scientific testimony.... In order to qualify as scientific knowledge, an inference or assertion must be derived from the scientific method. The government expert testified on the basis of specialized knowledge, not scientific knowledge."); *Thomas v. Newton Intern. Enter.*, 42 F.3d 1266, 1270 n. 3 (9th Cir.1994) ("*Daubert* was clearly confined to the evaluation of *scientific* expert testimony.") (emphasis in original) (citing *Daubert*, 509 U.S. at 590 n. 8, 113 S.Ct. at 2795 n. 8). This reading of *Daubert* is also

supported by the Supreme Court's explanation in *Daubert*, itself, that "[r]ule 702 also applies to 'technical, or other specialized knowledge.' Our discussion is limited to the scientific context because that is the nature of the expertise offered here." *Daubert*, 509 U.S. at 590 n. 8, 113 S.Ct. at 2795 n. 8 (emphasis added).

In *Thomas*, we concluded that the district court abused its discretion in excluding the expert testimony of a longshore worker with 29 years experience who proffered testimony as to customary safety procedures aboard a vessel. 42 F.3d at 1269. We noted that under Rule 702, an expert may be qualified by "knowledge, skill, experience, training, or education." We characterized the expert's testimony as based on his specialized knowledge acquired through his vast experience. *Id.* at 1270 n. 3. It was thus improper for the district court to exclude such testimony based on *Daubert*. *See id.*

. . . .

Similarly, we conclude that Siegel's testimony based on his engineering experience and his having investigated hundreds of fork lift cases over the past thirty years, that a safety device is feasible, is both "facially helpful and relevant" and seemingly reliable. *See id.* Crown will have every opportunity on cross-examination to point out that Siegel has not created or tested the safety device which he suggests would have prevented the accident. The district court erred in excluding Siegel's testimony based on *Daubert*.

*McKendall*, 122 F.3d at 806–08 (footnotes omitted).

Based on these authorities and principles, we hold that the *Daubert* analysis was not applicable to the instant case. Dr. Nordine's testimony was not based on "scientific knowledge" but rather was of the nature of "technical or other specialized knowledge." It is like the testimony in *Thornton* and *McKendall* to which a conventional rule 702 analysis is appropriate.

Applying our own principles governing expert testimony, we conclude that Dr. Nordine's opinion regarding Brian's OCD traits

was sufficiently established as reliable in the record. Dr. Nordine conducted a two-hour interview with Brian and reviewed documentation of his case, including a lengthy journal kept by Brian's father which chronicled Brian's behavioral problems. Dr. Nordine was familiar with OCD studies and the effect of environmental factors and cited to scientific articles and studies in support of his opinion. Additionally, Dr. Nordine is a board-certified neuropsychiatrist, licensed by the State of Iowa, who has experience treating patients with similar disorders and who testified to matters within his medical expertise.

Obviously, the subject matter of Dr. Nordine's testimony is not within the knowledge of laypersons. For that reason his testimony would have aided the jury on the critical issue: Were the OCD traits the result of the accident?

The plaintiffs also assert that Dr. Nordine's assessment of Joel Johnson as exhibiting OCD traits was irrelevant and prejudicial. We note, however, that Dr. Nordine did not offer an opinion concerning Joel's mental condition. Instead, he opined about Brian's relationship with Joel, stating that Brian was "relatively dependent" on his father. His opinion that the OCD features presented by Brian are related to family characteristics was not a statement involving genetics, which would pertain to scientific knowledge, but was a reference to family environment. As an opinion concerning the cause of Brian's disorder, the opinion was relevant to the determination of causation. Such an observation is not outside the bounds of Dr. Nordine's expertise, and was gained through an observation of Brian's father agreed to by the plaintiffs.

Under rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Iowa R. Evid. 403. Dr. Nordine's testimony has probative value because causation was the school district's primary defense to the plaintiffs' claims. The testimony supported the defendant's theory that Brian's behavioral problems were caused by other factors and were not due to the 1992 injury. Rule 403 is to be applied sparingly, *see Williams,* 561 N.W.2d at 832, and in this case

we believe the district court correctly determined that any possible prejudicial effect Dr. Nordine's testimony may have had did not render it inadmissible. It was then within the province of the jury to decide what weight to give such testimony in light of the expert testimony offered by the plaintiffs in support of their position.

For all of these reasons, we conclude the district court did not abuse its discretion in admitting Dr. Nordine's opinion testimony.

IV.   Evidence of Previous Injury

■   Plaintiffs also contend the court erred in allowing testimony pertaining to Brian's five previous head injuries. Although plaintiffs concede that the prior injuries were relevant in determining whether Brian had a pre-existing condition, they contend their admission was prejudicial because the school district had already admitted and stipulated to liability for the playground fall.

■   The determination of relevancy of evidence rests within the sound discretion of the trial court. *Harris v. Jones,* 471 N.W.2d 818, 821 (Iowa 1991); *Norton v. Adair County,* 441 N.W.2d 347, 357 (Iowa 1989). We reverse only if the trial court clearly abused its discretion to the prejudice of the complaining party. *Sanford v. Meadow Gold Dairies, Inc.,* 534 N.W.2d 410, 412 (Iowa 1995). The balancing decision under rule 403 is also a matter for the trial court's discretion. *Harris,* 471 N.W.2d at 821.

The testimony concerning Brian's five previous injuries was not introduced to show fault on the part of Brian or that his alleged recklessness contributed to the 1992 incident. Instead, it was introduced to dispute the causal link between the 1992 injury and Brian's OCD and other behavioral disorders. At issue at trial was whether Brian's disorders were the result of other factors, not solely the 1992 fall. Evidence that Brian had suffered numerous concussions on previous occasions, including loss of consciousness and vomiting episodes, supports this proposition. Such evidence is not overly prejudicial. The trial court did not abuse its discretion when it admitted this evidence.

## V. Parental Immunity

The plaintiffs also claim error in the introduction of testimony by Dr. Nordine concerning Brian's family situation and his opinion of its relation to Brian's OCD disorder. The plaintiffs claim this testimony is violative of Iowa's parental immunity provisions because it calls into question the discretion of parents to raise their children as they see fit. They claim any imposition of fault or liability to the Johnsons on account of their parenting would chill a parent's willingness to bring a suit on behalf of a child if such parenting skills were open to scrutiny.

We have explained parental immunity as follows:

> We hold that a parent is immune from liability for alleged negligent acts emanating from the parent-child relationship if the act involves an exercise of: (1) parental authority over the child; or (2) parental discretion in respect to the provision of food, clothing, shelter, education, medical and dental services, and other care.

*Griffith v. Smith*, 340 N.W.2d 255, 256 (Iowa 1983); *see also Frideres v. Schiltz*, 540 N.W.2d 261, 270 (Iowa 1995).

The district court correctly noted that the testimony in this case by Dr. Nordine did not in any way implicate legal liability on the part of Brian's parents. Rather, the testimony of Dr. Nordine was presented in an attempt to prove that Brian's condition may have had other causes and is not solely the result of the 1992 fall. The plaintiffs put Brian's condition at issue with their claim for damages. Given the existence of evidence that some of these behavioral deficits may be caused by Brian's surroundings, Dr. Nordine's opinion was admissible as expert testimony on this issue. The defendant presented this evidence solely to dispute the element of causation, a use that does not infringe upon the judicially-created parental immunity doctrine.

## VI. Proximate Cause

Although the defendant stipulated prior to trial that it was negligent, and the jury was so instructed, the plaintiffs were still required to prove proximate cause on all issues of damages. The trial court instructed the jury that it must decide the issue of proximate cause, as is consistent with our recognition that even though negligence has been established, proximate cause must be determined separately. *See Scoggins v. Wal-Mart Stores, Inc.*, 560 N.W.2d 564, 567–68 (Iowa 1997); *Blackhawk Bldg. Sys., Ltd. v. Aspelmeier, Fisch, Power, Warner & Engberg*, 428 N.W.2d 288, 290 (Iowa 1988); *Whiteaker v. State*, 382 N.W.2d 112, 116 (Iowa 1986).

The jury returned its verdict and answered "No" to the following question: "Was the fault of the defendant a proximate cause of damage to the plaintiff?" After answering this question in the negative, the jury did not proceed further, leaving blank the questions regarding the various damages alleged and whether the negligence resulted in damages to Joel and Barbara Johnson. Consequently, the jury found that defendant's negligence was neither the proximate cause of Brian's behavioral problems nor of the medical expenses incurred immediately following the injury.

## VII. Adequacy of the Verdict

If a jury verdict is not supported by sufficient evidence and the verdict fails to effectuate substantial justice, a new trial may be ordered. *Bredberg*, 551 N.W.2d at 326; *Thompson v. Rozeboom*, 272 N.W.2d 444, 446 (Iowa 1978). Substantial justice is inextricably linked to the adequacy of a jury verdict. As we have previously noted:

> We acknowledge an inadequate damage award merits a new trial as much as an excessive one. Iowa R. Civ. P. 244; *Matthess*, 521 N.W.2d at 702; *Witte*, 443 N.W.2d at 716. Whether damages awarded are adequate in a particular case depends on the facts of the situation. *Matthess*, 521 N.W.2d at 702. The test we must apply is "whether the verdict fairly and reasonably compensates the injury the party sustained." *Id.; see also Householder v. Town of Clayton*, 221 N.W.2d 488, 493 (Iowa 1974). Although evidence presented at trial may justify a higher damage award, this alone does not control. The key question is whether after examin-

ing the record, "giving the jury its right to accept or reject whatever portions of the conflicting evidence it chose, the verdict effects substantial justice between the parties." *Kautman v. Mar–Mac Community Sch. Dist.*, 255 N.W.2d 146, 148 (Iowa 1977); *see also Moore v. Bailey*, 163 N.W.2d 435, 437 (Iowa 1968). Another consideration for this court in examining the trial court's determination is "the fact the trial court, with benefit of seeing and hearing witnesses, observing the jury and having before it all incidents of the trial, did not see fit to interfere [with the jury's verdict]." *Olsen v. Drahos*, 229 N.W.2d 741, 743 (Iowa 1975).

*Foggia v. Des Moines Bowl–O–Mat, Inc.*, 543 N.W.2d 889, 891 (Iowa 1996).

■ The plaintiffs contend that the jury's failure to award any damages, in light of the defendant's admission of negligence and the record made that some damages were proximately caused by that negligence, necessitates a new trial. We agree with this contention.

The jury's failure to award any damages to the plaintiffs fails to effectuate substantial justice between the parties. Defendant stipulated that it was negligent regarding the fall that Brian suffered on the playground. Defendant also stipulated that the medical costs incurred by Brian for visits to his doctors since the injury and for the original hospitalization at Iowa Methodist Medical Center amounted to $10,171.33, and agreed that the amount was "fair, reasonable and necessary."

In their motion for new trial, plaintiffs assert that the finding by the jury of no proximate cause was contrary to the evidence. Our examination of the record convinces us that the jury verdict is not adequately supported in fact and law. Substantial justice was not effected by the jury's total denial of any damages recoverable by the plaintiffs. The trial court abused its discretion in failing to grant a new trial.

### VIII. New Trial

The inadequacy of the verdict necessitates that we remand this case for a new trial.

The district court shall order a new trial extending to all issues of proximate cause and damages, but not to the issue of defendant's negligence, which has been stipulated. *See Thompson v. Allen*, 503 N.W.2d 400, 401 (Iowa 1993); *Vorthman v. Keith E. Myers Enters.*, 296 N.W.2d 772, 778 (Iowa 1980).

We note that, under the special interrogatories submitted by the court, the jury was not required to make a separate determination of proximate cause as to each item of damage. Presumably, the jury could have found that the defendant's negligence was the proximate cause of some, but not all, of the plaintiffs' claimed injuries. Because damages must be itemized in this case, *see* Iowa Code section 668.3(8), at the new trial the jury should be given verdict forms that properly connect the issue of proximate cause to each item of damage claimed by the plaintiffs. To do this the following question should be asked:

Q. State the amount of damages sustained by the plaintiff that was proximately caused by the defendant's fault as to each of the following items of claimed damage. If the plaintiff has failed to prove that an item of damage was proximately caused by defendant's fault, enter zero for that item.

The jury will thus be able to find as to each of plaintiffs' claims whether proximate cause has been proved and the amount of damages, if any, resulting.

Costs on appeal are taxed to defendant.

### REVERSED AND REMANDED FOR NEW TRIAL.

All justices concur except TERNUS, J., who takes no part.